UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KEVIN W. JENTZEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CAUSE NO. 3:14cv2029 |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Kevin W. Jentzen appeals the Social Security Administration's determination that he is not disabled. In essence, he argues that the ALJ erred in discounting the opinion of his treating physician and in discounting his credibility. He also argues that the ALJ's reliance on the Vocational Expert's available jobs numbers was misplaced. Because I find that the ALJ's opinion was not supported by substantial evidence, I will **REMAND** his decision for further consideration and development of the record consistent with the issues discussed in this opinion.

## BACKGROUND

In June 2010, Jentzen fractured his ankle when he fell off of a ladder. The fracture was bad enough that it required surgery where some metal hardware was placed in his ankle to stabilize it (known as an "open reduction and internal fixation"). (R. 244-245.)[1] Dr. Burns, an orthopedist, performed both the surgery and follow-up care

---

[1] Citations to "R. ___" refer to the record page number indicated in the lower right hand corner of the record found at DE 9.

and appears to still treat Jentzen to this day. During the rest of 2010 and 2011, Jentzen faired ok, but was dealing with pain and swelling from time to time. Jentzen was released back to work (he was a carpenter) in 2011 and it seems that the swelling got somewhat worse, particularly at the end of the workday.

By January 2012, Dr. Burns noted that although Jentzen was back at work, he was "having persistent symptoms of pain, swelling, difficulty, and has really not been able to continue to perform all of his duties as a carpenter." (R. 180.) At that point, Jentzen was to continue "his local modalities, icing, and his anti-inflammatory as needed." (*Id*.) At this point, Dr. Burns found that Jentzen was disabled from his work as a carpenter. (*Id*.) Jentzen was then referred to Diveris Orthopedic and Sports Medicine for further evaluation and treatment. There, Jentzen reported intermittent swelling, pain, crepitus, and numbness/tingling (R. 231) and was disgnosed with a "late effect of fracture of lower extremities" (R. 233).

In March 2012, Dr. Burns recommended another ankle surgery called an ankle fixation. (R. 236.) Dr. Burns felt it would help with the pain, but warned that Jentzen's range of motion would not be normal. Jentzen declined surgery. At that visit, Jentzen had some mild swelling in his ankle and foot, but not much. About a year later, Dr. burns prescribed Jentzen a cane. (R. 236.) There's a lapse in the medical records between March 2012 and March 2013, so it's not clear if Jentzen was being treated during that time. In any event, when Dr. Burns saw him again in April 2013 about his ankle, Dr. Burns discovered that Jentzen's blood pressure was very high and that

2

became the main focus of the visit. (R. 240.) Dr. Burns did note, however, that his examination revealed that Jentzen still had chronic swelling in his ankle and significant posttraumatic changes to the ankle, but that he wasn't in great discomfort. (*Id*.)

That same month, Dr. Burns completed a medical source statement on Jentzen's behalf. There, Dr. Burns listed the various limitations Jentzen faced in a work environment, but most significant to the arguments before me is the fact that Dr. Burns noted Jentzen's chronic swelling in his ankle. (R. 254.) He further found the swelling caused significant limitations in weight-bearing activity and that Jentzen "must . . . elevate leg frequently." (*Id*.) In addition to the medical source statement, Dr. Burns also submitted a letter explaining that the treatment notes from Jentzen's most recent office visit did not accurately reflect how chronic and significant Jentzen's ankle problems were because his blood pressure became the immediate focus and concern. (R. 250.) Dr. Burns again stated that Jentzen required and would continue to require treatment for his chronic ankle swelling with "frequent elevation." (*Id*.)

Jentzen applied for disability insurance benefits on January 12, 2012, alleging a disability onset date of October 26, 2011. (R. 20.) He was denied on both consideration and reconsideration. (*Id*.) After a hearing before an ALJ in which Jentzen testified, the ALJ issued a decision denying benefits. (*Id*. at 20-33.) The ALJ employed the standard five-step analysis. (*Id*.) At step one, the ALJ confirmed that Jentzen had not engaged in substantial gainful activity since his application date. (*Id*. at 22.) At step two, the ALJ found Jentzen suffered from severe impairments of left ankle fracture and fixation and

obesity. (*Id*.) At step three the ALJ found that Jentzen's conditions did not satisfy any listed impairment. (*Id*.) At step four, in analyzing Jentzen's residual functional capacity, the ALJ found that Jentzen could:

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) where the claimant can occasionally lift/carry up to ten pounds, and can frequently lift/carry less than ten pounds. The claimant can stand and/or walk for two hours of an eight-hour workday. The claimant is limited to standing not more than 30 minutes at a time. The claimant is limited to walking not more than five minutes at a time. The claimant needs a cane at all times while walking. The claimant can sit for six hours of an eight-hour workday. The claimant can never climb ladders, ropes, and scaffolds. The claimant can occasionally crouch. The claimant must avoid uneven terrain, and wet terrain. The claimant must avoid concentrated exposure to wetness. The claimant must be able to elevate his legs to [*sic*] during his break periods and lunch during the workday.

(*Id*. at 23) At step five, the ALJ found Jentzen could not perform past relevant work but there were a sufficiently significant number of jobs in the national economy he could perform. (*Id*. at 28.)

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (DE 13 at 1-2) Jentzen timely sought review of that decision by filing this case. Jentzen's arguments on appeal are that the ALJ improperly evaluated the opinion of his treating physician, Dr. Burns, and also improperly evaluated his credibility regarding the severity of his symptoms. Jentzen further argues that the ALJ erred in finding that there were a significant number of jobs in the national economy that he could perform.

**DISCUSSION**

If an ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Review of the ALJ's findings is deferential. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

At bottom, as the parties have framed it, whether Mr. Jentzen is disabled comes down to the narrow issue of how long and how often must he elevate his legs. The ALJ found in Jentzen's RFC that Jentzen "must be able to elevate his legs to [*sic*] during his break periods and lunch during the workday." (R. 23.) During Jentzen's hearing, the vocational expert testified that the jobs that Jentzen can still perform would typically allow for two 15-minute breaks and one 30-minute lunch break each day. (R. 61.) Thus, the RFC allows Jentzen to elevate his legs for one-hour in total each work day.

At first blush, that seems pretty reasonable. Jentzen himself testified that he elevates his legs three or four times a day during his entire waking hours (R. 45) and that his typical schedule is to elevate once first thing in the morning and then again midday. (R. 51.) Although he didn't testify as to when the other elevation sessions occur, it'd probably be reasonable to assume they happen at similar intervals – maybe

late afternoon/early evening and then again before bed. Seemingly the RFC would allow him to keep that schedule, plus afford two additional 15-minute breaks for more elevation.

But that's not the full story. Jentzen says that he needs to elevate his legs 3-4 times a day for 30 minutes each time. So if that's the case, those 15-minutes breaks wouldn't do him much good. And Jentzen also testified that he needs to elevate them after an hour to an hour and a half of sitting. (R. 47.) Jentzen testified that his typical day involves a mix of standing, walking, and sitting – going out to run errands, walking around the house a bit, and sitting when needed. (*See e.g.* R. 49.) But at a sedentary job, he'd likely be sitting more. And if it's true, he would need to elevate his leg every hour and a half (or more) and he would have to do it for a half hour each time. Such a regimen would amount to about two hours of leg elevation time during working hours. Given that he has only one hour worth of breaks during the day, that would require an extra hour of break time. And the VE testified that requiring even half of that – two extra 15-minute breaks – would eliminate all of the jobs in the national economy for him. (R. 61-62.) Thus, the duration and frequency of Jentzen's need to elevate his legs is critical to determining whether he can still work.

So what does Jentzen's treating physician have to say about all of this? Unfortunately, not a whole lot. But what he *does* say in his medical source statement is that Jentzen has "severe chronic edema," must be "elevating his ankle as much as possible," and "currently is requiring treatment with his compression garment and

frequent elevation." (R. 250.) Dr. Burns concludes that "[h]e will continue to require treatment for his chronic swelling with elevation, ice, and his compression garment." (*Id*.) This leaves me with a few questions: what qualifies as "frequent" elevation or "elevating his ankle as much as possible?" How long does Jentzen need to elevate during each session? What happens if he doesn't follow the protocol?

     Rather than seek out the answers to any of these questions, the ALJ instead discounted Dr. Burns' opinion as unsupported by the record because Dr. Burns had not specifically recommended elevation in the treatment notes. (R. 26.) Generally speaking, a treating physician's opinion is afforded controlling weight so long as it is well-supported and not inconsistent with other substantial evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). But just because Dr. Burns didn't make the specific recommendation in his past treatment notes to elevate the leg, it does not mean that recommendation is unsupported. Dr. Burns states that the reason for elevation is that Jentzen suffers from chronic edema and swelling and those conditions *are* documented in the record. (R. 180, 231, 240, 250, 254.) And the ALJ doesn't point to anything in the record that contradicts or conflicts with Dr. Burns' opinion that Jentzen must elevate his leg. Moreover, I'm not sure it's accurate to suggest that Dr. Burns doesn't mention elevation. He repeatedly mentions that Jentzen is to continue with his "local modalities" – whatever that is. (*See e.g.* R. 180-83.) Maybe that refers to leg elevation and maybe it doesn't, but I think that's something the ALJ should have at least explored before finding that Dr. Burns ignored that treatment entirely.

7

The ALJ also based his opinion that Jentzen doesn't need to elevate his leg on his belief that elevation was a treatment Jentzen came up with on his own. (R. 26) But it's not clear to me why it matters who came up with the treatment first – what seems to be most important is that Dr. Burns recommends it as necessary treatment going forward based on the symptoms both reported to and directly observed by Dr. Burns in the record. What's more, despite the fact that the ALJ discounts Dr. Burn's opinion and finds Jentzen to be "not fully credible," he still requires in the RFC that Jentzen be allowed to elevate his leg during work breaks. So which is it? Are the claims about elevation not credible or should they be required? It strikes me as odd that he would find the recommendation less than credible and then require it. And the ALJ also doesn't explain how he arrived at the frequency and duration ("work breaks") that he requires for elevation. Without more information about Jentzen's need to elevate his legs, it's hard to see how the ALJ has built an accurate and logical bridge from the evidence to the conclusion that his work breaks would adequately serve that need. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

In any event, I find that the ALJ should have done more to develop the record in this respect. There is no reason he couldn't have followed up with Dr. Burns to get a more precise view on Jentzen's need to elevate his leg. Although the ALJ does not have the duty to follow every thread of evidence to its absolute conclusion, an ALJ does have a duty to fully develop the record, including recontacting physicians for clarification. *O'Connor-Spinner v.* Astrue, 627 F.3d 614, 618 (7th Cir. 2010); *Barnett v. Barnhart*, 381 F.3d

8

664, 669 (7th Cir.2004); S.S.R. 96–5p; *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir.2009); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir.2014). And that's even more the case where the limitation at issue is the one on which the disability decision is being based. Something more needs to be done here, so I will remand this matter back to the ALJ for further development of the record consistent with this opinion.

One other issue needs to be addressed relating to the ALJ's Step Five analysis on the number of jobs available to Jentzen. The Seventh Circuit has recently raised serious concerns with how the number of available jobs is calculated in social security cases. *See, e.g., Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. Aug. 18, 2015); *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). These cases, and others, all express similar concerns about the where the VE's jobs data comes from and how those numbers are calculated.

The biggest problem is that when determining how many jobs exist for a particular occupation, the only census data out there is for the representative categories (*i.e.* broad categories of jobs that group together large numbers of similar occupations). *See e.g. Alaura*, 797 F.3d at 507. That's all well and good if someone can perform every job listed in that category, but as is often in the case, those categories frequently list jobs at various activity and skill levels that someone with limits in those areas would not be able to perform. So how, then, does a VE determine how many of the jobs that the claimant *can* perform exist? Apparently they typically divide the total number of jobs in

9

the broader category by the number of job titles in that category. *Id.* Thus, VE's assume that there are an equal number of specific jobs within one category – which makes no sense. This has significant ramifications because ALJs frequently rely on this data to conclude that there are a sufficient number of jobs in the economy that the claimant can perform to prevent a finding of disability. For instance, let's say a VE assumes that there are 1,000 available jobs in the economy and in reality, there are more like 50 such jobs available. In that scenario, we've sent someone with limited abilities out to find a job where hardly any jobs he or she can perform exist. That is wholly inconsistent with the purpose of the social security disability system.

This exact issue appears to be present here. Jentzen argues that the VE presented numbers for broad categories of jobs that included jobs Jentzen could not perform, as each category included jobs that exceeded a sedentary work level. (*See* DE 19 at 5.) Indeed, the VE testified that the jobs numbers she provided related to more general categories of jobs, and then did not explain how she arrived at the numbers provided for the specific jobs she found Jentzen could perform. (R. 60.) In his opinion denying benefits, the ALJ simply took these numbers at face-value without much discussion. (R. 28.) Maybe the numbers of the jobs Jentzen can perform are actually *higher* than what the VE reported, or maybe they're lower. If it's the latter, that has the potential to change the outcome of Jentzen's case.

The Commissioner argues that because Jentzen's attorney didn't specifically challenge these numbers at the administrative hearing, Jentzen has forfeited his right to

make this argument, as set forth in *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002). But here, the ALJ actually elicited testimony from the VE that should have raised eyebrows – that her numbers were based only on the broader categories. (R. 60.) That alone triggered his duty to investigate further, which he failed to do. *See Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008). It may very well be that the VE used some more reliable method to calculate her numbers or has some other support for her conclusion, but on the record before me, there are too many open questions. The ALJ should therefore further investigate the basis for the VE's jobs numbers on remand.

## CONCLUSION

For the forgoing reasons, the decision of the Commissioner is **REMANDED** for further consideration and development of the record consistent with this opinion.

**SO ORDERED**.

ENTERED: March 18, 2016

s/Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT